UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN DELEON, *Plaintiff*, v. SERGEANT JOHNSON, et al. *Defendants*. | No. 24-CV-8101 (KMK) OPINION & ORDER |

Appearances:

Jonathan DeLeon
Dannemora, NY
*Pro se Plaintiff*

Jennifer L. Goltche, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Jonathan DeLeon ("Plaintiff") brings this Action against Sergeant Johnson ("Johnson"), Corrections Officer Bell ("Bell"), Corrections Officer Pagan ("Pagan"), Superintendent Miller ("Miller"), (together, "Defendants"), as well as a Corrections Officer Kreischer ("Kreischer"),[1] Sergeant Clark ("Clark"), Corrections Officer Rodriguez ("Rodriguez"), and Corrections Officer Phillips ("Phillips"),[2] seeking equitable and monetary relief for asserted violations of his First

[1] In Plaintiff's filings, he spells Officer Kreischer's name inconsistently. In references to this individual, the Court conforms the spelling to the name as it appears on the docket.

[2] On January 6, 2025, the Court issued an order of service for each of the named defendants in this Action. (*See* Dkt. No. 10.) On February 14, 2025, the summons for the Officer "Phil" identified in the Complaint was returned unexecuted, with the note that "Correction Officer Phil does not work at Green Haven." (Dkt. No. 15.) However, in later filings, Plaintiff explained that this individual is actually named "Phillips." (*E.g.* Dkt. No. 46 at

Amendment right to be protected from retaliation for the filing of Prison Rape Elimination Act ("PREA") complaints and grievances, as well as an asserted failure to protect him in violation of his Eighth Amendment rights. (*See generally* Compl. 3–4 (Dkt. No. 1).) Before the Court is Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (*See* Mot. to Dismiss ("Mot.") (Dkt. No. 57).) For the reasons that follow, Defendants' Motion to Dismiss is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Complaint and are assumed true for the purpose of resolving the instant Motion. "In light of [Plaintiff's] pro se status, the Court also considers factual allegations made in [his] . . . court filings" other than his Complaint. *Harriram v. Fera*, No. 21-CV-3696, 2024 WL 1020266, at *1 n.2 (S.D.N.Y. Mar. 8, 2024). When citing Plaintiff's various pleadings, the Court refers to them using their docket number as generated by the Court's Electronic Case Filing System, as well as page numbers generated by that system,

---

5.) Therefore, in the discussion of the facts at issue in this Action, the Court refers to this individual as "Officer Phillips" or "Phillips."

On February 21, 2025, the summons for Sergeant Clark, (Dkt. No. 17 at 1), and Officer Kreischer, (Dkt. No. 18 at 1) were likewise returned to sender on the asserted basis that these individuals did not work at Green Haven Correctional Facility, where the summons had been sent. And on July 17, 2025, the summons for Officer Rodriguez was returned unexecuted because there "were multiple employees with the same last name," and so the individual's "first name or badge number" was needed to identify the defendant. (Dkt. No. 33 at 1.)

As these individuals were never served, the Court currently lacks jurisdiction over them. *See, e.g.*, *Cyrus v. Lockheed Martin Corp.*, No. 20-CV-6397, 2022 WL 203750, at *3 (E.D.N.Y. Jan. 24, 2022); *Anzulewicz v. Nat'l Fuel Gas Supply Corp.*, 208 F.R.D. 47, 50 (W.D.N.Y. 2002). Accordingly, the viability of those claims is not discussed further. In recognition of Plaintiff's *pro se* status, the Court extends his deadline to serve these individuals to 60 days from the date of this Opinion.

which appear on the top-right corner of each electronically filed page. Although, as Defendants note, Plaintiff's pleadings largely involve "vague references to the alleged incidents having taken place in New York State Department of Corrections and Community Supervision ('DOCCS') prison facilities" which are mostly "transcribed non-chronologically, making the alleged sequence of events confusing," (Mem. of Law in Supp. re: Mot. to Dismiss ("Defs.' Mem.") 1 (Dkt. No. 58)), the Court has an obligation to construe the allegations of a pro se Plaintiff charitably, and so has searchingly reviewed Plaintiff's various filings in an attempt to present a cohesive narrative in the light most favorable to Plaintiff.

Plaintiff alleges that the Defendants "act[ed] in concert to deprive [him] of [his] [Eighth] Amendment [right] to be free from cruel and unusual punishment and [engaged in] retaliation [for activity] protected by the [First] Amendment [constituting] free speech." (Dkt. No. 56 at 1.)[3] Plaintiff says that officials made "[f]abricated accusations" against him. (*Id.*) He describes multiple incidents that, he claims, represent violations of his constitutional rights.

On March 10, 2024, Plaintiff says that an Officer Martinez "tried to fight [him] and harass[ed]" him "calling" him "names[,] [and] disrespecting [him]." (Dkt. No. 32 at 4.) He wrote a grievance and a PREA report. (*Id.*) He was then moved to Green Haven Correctional Facility. (*Id.*) Due to continued harassment, Plaintiff asked Rodriguez for protective custody

---

[3] In just one of his filings, Plaintiff mentions assaults that occurred on July 25, 2023, by individuals not named as defendants, and alleges that he was placed in confinement to monitor his excrement for contraband that he may have swallowed. (Dkt. No. 32 at 1, 2–3.) Similarly, Plaintiff alleges beatings from individuals not named as defendants in this action that predate the remainder of his allegations. (Dkt. No. 27 at 4.) "These allegations are unrelated to the claims raised in the Complaint," appear unrelated to the Defendants, and are unrelated to the allegations contained in Plaintiff's other filings. *Lamont v. Farucci*, No. 16-CV-7746, 2017 WL 6502239, at *10 n.19 (S.D.N.Y. Dec. 18, 2017). The Court therefore addresses them no further.

repeatedly starting on April 10, 2024. (*Id.* at 4; *see also* Dkt. No. 27 at 1 (describing similar sequence of events).)

On May 1, 2024, Plaintiff was threatened in the prison yard; he told Rodriguez about this event and apparently expressed "safety concerns" to her, seemingly asking to be placed in protective custody. (Dkt. No. 56 at 1–2.) At some point, likely around this time or slightly thereafter, Plaintiff reported that there was a "hit" on his life, (Dkt. No. 54 at 1), and his mother wrote to the facility where he was housed, expressing concern for his safety, (Dkt. No. 51 at 1). On or around May 5, 2024, Plaintiff asked Rodriguez to be placed in protective custody, and she told other incarcerated individuals that he "was a rat." (Dkt. No. 51 at 1; *see also* Dkt. No. 1 at 4 (describing similar incident on or around May 6, 2024).) On or around May 8, 2024, a grievance, possibly the same one mentioned above, "was forward[ed] to [G]reen [H]aven [Correctional Facility] [f]rom Sing Sing [Correctional Facility,] w[h]ere" a Sergeant, sued as a John Doe Defendant, told Plaintiff to "sign[] off on the grievance." (Dkt. No. 56 at 2.) In response to the grievance, Plaintiff says that "this [D]efendant," seemingly referring to the John Doe, "started to harass[]" him, as did Rodriguez. (*Id.*) The grievance was not properly processed. (*Id.* at 3.) On or about May 8, 2024, or May 9, 2024, Plaintiff says that an incarcerated person threw a bucket of water into his cell after Rodriguez told this individual that Plaintiff was a "rat" who wanted to be placed in protective custody.[4] (*Id.* at 1, 2–3; *see also* Dkt.

[4] In one of his many filings, Plaintiff says that on May 9, 2024, a corrections officer "who inmates call 'O, [due] to [his] Af[r]ican name'" received threats against him and "wr[o]te[] [the] Superintend[e]nt and Sergeant Rio who was in cahoots with inmates" who were verbally threatening him. (Dkt. No. 46 at 1.) This is the only significant description of the actions of Officer "O" or Sergeant Rio in Plaintiff's filings. (*Id.*) In the same filing, Plaintiff mentions an officer "Talelaska" who assertedly wrote him "a misbehavior [report] in retaliation for requesting [protective custody]" and told other individuals that Plaintiff was a "rat." (*Id.*) These individuals are not named as Defendants. (*Id.*)

No. 1 at 4; Dkt. No. 27 at 1.) Sometime on May 9, Plaintiff again requested protective custody. (Dkt. No. 56 at 2.)[5] Plaintiff also was interviewed after a fight with another inmate and told Defendant Doe that he "ha[d] enem[ies] who [we]re targeting [him] to do a hit on [his] life." (Dkt. No. 51 at 2.)

On May 10, 2024, Plaintiff "cut [him]self," as he was "feeling hopeless after not getting any help from Rodriguez" and "being verbal[l]y harasse[d]" by other inmates at Rodriguez's encouragement. (Dkt. No. 56 at 2.) That same day, Plaintiff reported to Defendant Johnson that he needed protective custody. (Dkt. No. 51 at 1.) On or around May 11, 2024, Plaintiff was cursed out by Defendant Bell, who also had other incarcerated people verbally harass him, and in response he made a Prison Rape Elimination Act ("PREA") complaint against her. (*Id.*; *see also* Dkt. No. 27 at 1 (alleging that Plaintiff made a PREA complaint against Defendant Bell because she told him to "suck her [d]ick" and had inmates target him and destroy his property).) On May 13, 2024, Plaintiff's request to be placed in protective custody was denied, apparently by Rodriguez and Defendant Johnson. (Dkt. No. 56 at 3.) Instead, Plaintiff was "moved to a different [b]lock" in the facility. (*Id.*) This move, Plaintiff claims, was carried out with the intent of his being "targeted by inmates with verbal assa[u]lts of being a RAT." (*Id.*) It appears that these intended "verbal assa[u]lts" did, in fact, occur, as Plaintiff alleges that he was harassed by other incarcerated people. (*Id.*) In a separate filing, Plaintiff also alleges that he was placed in protective custody "for a few hours" on May 13, 2024, or possibly some time before May 12, 2024, but ultimately removed that same day by Sergeant Perrez and a Lieutenant John Doe.

---

[5] While Plaintiff lists this date as May 9, 2025, the events are largely presented chronologically and would be more consistent with a May 9, 2024 reporting date. (*See* Dkt. No. 56 at 2.) Accordingly, and in light of Plaintiff's status as a pro se litigant, the Court assumes for the purposes of the instant Motion that this event is alleged to have occurred on May 9, 2024.

(Dkt. No. 46 at 1; *see also* Dkt. No. 32 at 1–2 (alleging that, on May 12, 2024, Plaintiff was singled out and removed from protective custody after his family called and requested that he be placed in protective custody, and that Plaintiff was placed in and removed from protective custody "the same day a few hours later on 5-13-24").) On May 25, 2024, Bell prevented Plaintiff from going to the grievance call out, "calling [him] a RAT [in] retaliation [f]or the grievance." (Dkt. No. 56 at 3.)

On May 26, 2024, Plaintiff reported threats against him to Defendant Johnson, who told him he would be placed in protective custody the next day; he was not placed in protective custody but was taken off that list by two Jane and John Doe Defendants. (Dkt. No. 27 at 2.) Plaintiff told Defendant Miller that he needed to be placed in protective custody, both personally and by letter some time on or around May 26, 2024 (Dkt. No. 46 at 2), May 28, 2024, (Dkt. No. 27 at 2), or May 29, 2024, (Dkt. No. 46 at 2); Miller also received an unspecified OSI report related to Plaintiff, (*id.*). Plaintiff's family also reported concerns about his safety to Miller. (Dkt. No. 54 at 1.) Miller seems to have been unresponsive. (*See* Dkt. No. 46 at 2; Dkt. No. 54 at 1.)

On May 30, 2024, Plaintiff says that Clark denied Plaintiff protective custody, (Dkt. No. 56 at 3), perhaps by "tricking [him] into signing a [protective custody] refusa[]l [form] . . . after informing [him] that [he] w[ould] get [protective custody] after [he] signe[d] the [b]lue form," (Dkt. No. 46 at 2). Plaintiff says that Defendants verbally harassed him, having "inmates go[] back and forth with [him]" "by listening to [him] thr[o]u[gh] a cell speaker" that allows "only [corrections officers] [to] hear [him]" and verbally harass him. (Dkt. No. 51 at 2.) This culminated in another event on May 30, 2024, in which Defendants Bell, Kreischer, and Johnson had inmates "verba[l]ly assa[u]lt" him "while us[]ing the cell intercom to hear if [he would] say

something" in response, which they intended to relay to other incarcerated people to have Plaintiff targeted. (*Id.* at 3; *see also* Dkt. No. 1 at 5 (describing officers using the cell's intercom to hear what Plaintiff says and verbally harass him).) That same day, Plaintiff was involved in a fight due to an Officer Bar's verbal harassment through other incarcerated people. (Dkt. No. 46 at 1.)

On June 1, 2024, Kreischer, Bell, and Pagan, along with Rodriguez and Johnson, prompted inmates to harass Plaintiff and call him a "rat" again. (Dkt. No. 56 at 3.) Kreischer, Bell, Rodriguez, Miller, Clark, and Johnson all reportedly were aware of and/or participated in propagating the narrative that Plaintiff was a "rat" and failing to protect him from other incarcerated individuals. (Dkt. No. 55 at 1.) On June 8, 2024, Phillips told incarcerated people in the facility that Plaintiff "was a rat," and tried to "sign[] into [protective custody] on Bloods and Crips to have [Plaintiff] targeted by gang members." (Dkt. No. 51 at 2; *see also* Dkt. No. 1 at 4 (describing similar incident); Dkt. No. 46 at 2 (alleging that Phillips told two incarcerated individuals that Plaintiff tried to sign into protective custody, seemingly as protection from these individuals).)

On June 9, 2024, Plaintiff told Defendant Doe that he needed protective custody and that there was a hit on his life. (Dkt. No. 51 at 2.) Defendants Bell and Kreischer harassed Plaintiff about the grievance, calling him a rat and mocking his request for protective custody. (Dkt. No. 56 at 5; *see also* Dkt. No. 46 at 2; Dkt. No. 51 at 1.) Clark, too, may have been involved in this harassment. (Dkt. No. 27 at 2 (describing, as occurring on June 9, 2024, "a fight" where Clark "told [Plaintiff] to sign[] [a form] so [he] c[ould] get protective custody" but then Clark "told inmates [Plaintiff] was a rat").) This harassment "lead to [Plaintiff] being targeted in the messhal[l] and assa[u]lted/[b]atter[ed] by [other] inmates." (Dkt. No. 56 at 5.) In one of his

filings, Plaintiff explains that he, along with several other incarcerated people, walked into the mess hall wearing hats. (Dkt. No. 46 at 3.) Defendant Doe told Plaintiff, but not the other hat-wearers, to remove his hat. (*Id.*) Other incarcerated individuals "started to harass[] [Plaintiff]" and asked him "what the fuck [he was] looking at," and made threats. (*Id.*) Plaintiff asked "what's the problem?" and, in response, was punched in the face and back. (*Id.*) Defendants Pagan and Kreischer, as well as John Doe, "let[] the assa[u]lt continue," "watch[ing] [Plaintiff] get assa[u]lted by multiple inmates" without intervening for several minutes. (Dkt. No. 56 at 5; *see also* Dkt. No. 27 at 2 (describing officials taking no action "for about 5 minutes" while Plaintiff was being assaulted); Dkt. No. 46 at 3 (explaining that Defendants Doe and Pagan "just stood wa[tch]ing [Plaintiff] get assaulted[,] doing nothing to stop the assa[u]lt [until] 3 minutes later"); Dkt. No. 51 at 1 (describing an assault by three inmates where Defendants Pagan, Kreischer, and Doe "did nothing to stop the fight [u]ntil[] minutes later").) It appears that Plaintiff experienced two such assaults by other inmates on June 9, 2024. (Dkt. No. 55 at 1; *see also* Dkt. No. 51 at 2 (describing two assaults the morning after Phillips tried to "sign[] into [protective custody]" to have Plaintiff targeted by gang members).) During one of them, he was stabbed, seemingly in his cell or cell block area, (Dkt. No. 54 at 1; Dkt. No. 51 at 2), after he asked another incarcerated person for a cigarette, (Dkt. No. 27 at 2).[6] (*See also* Dkt. No. 1 at 5 (describing similar incident); Dkt. No. 6 at 1 (describing stabbing incident on June 9, 2024).)

After the assaults, Doe, Johnson, and Pagan denied Plaintiff any protective custody. (Dkt. No. 56 at 5.) Doe asked Plaintiff "if [he] need[ed] protection," and, when Plaintiff said

[6] This may or may not be the same as an incident where Plaintiff alleges he was assaulted and battered with a knife-type weapon and that Defendants Bell and Kreischer failed to protect him. (Dkt. No. 56 at 7.)

"yes," Doe "told [him] to sign[] the blue card and [Doe] w[ould] place [Plaintiff] in [protective custody.]" (Dkt. No. 27 at 2.)[7] Pagan then told Defendant Bell that Plaintiff would be sent back to his cell. (Dkt. No. 56 at 5.) Defendant Pagan was designated as Plaintiff's escort, but failed to escort him to his cell. (*Id.*) It appears that the second assault mentioned above may have occurred after Plaintiff was returned to his cell. (Dkt. No. 46 at 3.) All of this, Plaintiff claims, was retaliation for his grievance. (Dkt. No. 56 at 5.)

On October 21, 2024, or possibly October 31, 2024, Plaintiff was again threatened and targeted by incarcerated people at the prompting of officials (who are not named as Defendants). (Dkt. No. 32 at 2.) Plaintiff "was assaulted and cut by inmates" in the North Yard of Clinton Correctional Facility. (*Id.*; *see also* Dkt. No. 51 at 3 (describing Plaintiff being "cut across [his] face" and called a "rat" for making a claim pursuant to Section 1983).)[8]

The aforementioned events allegedly caused Plaintiff mental anguish and physical pain, as his injuries required him to receive one staple on his scalp and two stitches in his neck. (Dkt. No. 56 at 7.) He says that this treatment caused nerve damage to his neck, leaving him with a stiff neck. (*Id.*)

---

[7] In one of his filings, Plaintiff describes a virtually identical event as occurring on May 14, 2024. (Dkt. No. 32 at 5.)

[8] In one of his filings, Plaintiff describes the same events, and identifies several individuals not named as Defendants here who, he says, "influence[d] inmates to target [him and] threaten [him]" while also ignoring his requests for help. (Dkt. No. 28 at 2.) "Because it does not appear that [Plaintiff] intends to sue these individuals, and because nothing in the docket indicates that they have been served or named as defendants, the [C]ourt will not address these allegations." *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *1 n.2 (E.D.N.Y. June 9, 2011), *aff'd*, 548 F. App'x 29 (2d Cir. 2013) (summary order). The Court declines to consider certain additional allegations relating to Plaintiff's treatment "in Five Points Box by Sergeant Mackentash and Officials Allen," the date of which is not legible and which appear wholly unrelated to the other allegations described herein, as well as other similar allegations from October 2024. (Dkt. No. 27 at 3.)

At some point between late 2024 and late 2025, Plaintiff says that his property—and specifically a package—was destroyed as well as his "legal work." (*Id.* at 3, 5; Dkt. No. 51 at 3.) It appears that an individual not named as a Defendant, Officer Martin, said that Plaintiff "signed a claim withdraw[al]" although Plaintiff did no such thing. (Dkt. No. 51 at 3.)

It seems that Plaintiff has now been placed in protective custody. (*See* Dkt. No. 56 at 2.)

B. Procedural Background

Plaintiff commenced this Action on October 23, 2024. (*See* Compl.) On November 25, 2024, Plaintiff filed a "Supplemental Complaint." (Dkt. No. 6.) On December 19, 2024, the Court granted Plaintiff leave to proceed in forma pauperis. (Dkt. No. 9.) On January 6, 2025, the Court deemed the Complaint together with Plaintiff's "Supplemental Complaint" the operative pleading in the Action, and ordered service of the named defendants. (Dkt. No. 10.)

As mentioned above in note 2, only some of the named defendants have been properly served. In a subsequent letter, Defendants' counsel explained that her office was working to transmit summonses, the Complaint, and service waivers to Kreischer, Phillips, and Clark. (Letter from Jennifer Goltche, Esq. to Court (May 2, 2025) 1 (Dkt. No. 24).) Subsequently, counsel explained that her office had been unable to identify Officer Phillips or Sergeant Clark. (*See* Letter from Jennifer Goltche, Esq. to Court (May 14, 2025) 1 (Dkt. No. 25).)

Plaintiff then began to file multiple documents, apparently attempting to provide additional information to effect service and seeking to add further factual allegations. (Dkt. No. 26; Dkt. No. 27; Dkt. No. 28.) Defendants responded, stating that the information was still insufficient to identify Defendant Rodriguez, and seeking clarification on the operative Complaint. (Letter from Jennifer Goltche, Esq. to Court (June 13, 2025) 1 (Dkt. No. 29).) The

Court provided Plaintiff an opportunity to amend his operative Complaint. (Mem. Endorsement dated June 13, 2025 (Dkt. No. 29).)

About a month later, Plaintiff filed two additional documents containing similar allegations, attempting to clarify his earlier filings. (Dkt. No. 32; Dkt. No. 38.) Counsel for Defendants took the position that "[r]ather than provide clarity, Plaintiff's letters only allege more conclusory allegations against various unidentified and unidentifiable parties." (Letter from Jennifer Goltche, Esq. to Court (Aug. 6, 2025) 1 (Dkt. No. 39).) Plaintiff filed additional documents, including a letter motion purportedly seeking discovery, which the Court denied on the basis that he had not filed a Complaint that set out his claims. (Dkt. No. 41; Dkt. No. 50; Dkt. No. 44.) Again, Plaintiff attempted to file an amended pleading. (Dkt. No. 46.)

On October 8, 2025, the Court scheduled a telephonic conference to address the pleading issues. (*See* Calendar Notice (Dkt. No. 47).) The conference was held, and Plaintiff was directed to file a new complaint. (*See* Dkt. (minute entry for proceedings held on Oct. 29, 2025).) In November and December of 2025, Plaintiff filed three additional documents seeking to amend his Complaint. (Dkt. No. 51; Dkt. No. 54; Dkt. No. 55.)

On December 29, 2025, the Court set a briefing schedule on an anticipated Motion to Dismiss the Action pursuant to Rule 12(b)(6). (Order dated Dec. 29, 2025 (Dkt. No. 53).) Shortly thereafter, but before Defendants filed their Motion, Plaintiff filed another letter including additional factual allegations largely overlapping with Plaintiff's existing filings. (Dkt. No. 56.)

On January 29, 2026, Defendants filed the instant Motion, as well as their supporting Memorandum of Law. (*See* Mot.; Defs.' Mem.) The deadline came and went for Plaintiff's opposition. (*See generally* Dkt.) The Court issued an endorsement directing Plaintiff to respond

by April 3, 2026, or the Motion would be deemed fully submitted. (*See* Mem. Endorsement dated Mar. 19, 2026 (Dkt. No. 60).) Plaintiff never responded, and so the Court now deems the Motion fully submitted. *See Price v. Koenigsmann*, No. 19-CV-4068, 2022 WL 125818, at *3 (S.D.N.Y. Jan. 13, 2022) ("To date, Plaintiff has failed to respond to Defendants' Motion; the Motion is hereby deemed fully submitted.").

## II. Discussion

### A. Standard of Review

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Specifically, the plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, the "purpose

of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quotation marks omitted). To decide the motion, the Court "may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quotation marks omitted).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (citation and quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

B. Analysis

Liberally construed, Plaintiff's filings claim that he was subjected to retaliation in violation of his First Amendment rights, that Defendants acted negligently towards him, and that the Defendants' actions constitute cruel and unusual punishment in violation of his Eighth Amendment rights based on the failure to protect him from harm inflicted by other incarcerated individuals. (*E.g.*, Dkt. No. 56.) Accordingly, the Court evaluates whether Plaintiff's pleadings state a viable First Amendment retaliation, Eighth Amendment failure to protect, or negligence claim.

1. First Amendment Retaliation

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bonie v. Annucci*, No. 20-CV-640, 2023 WL 2711349, at *12 (S.D.N.Y. Mar. 30, 2023) (quoting *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at *13 (S.D.N.Y. Mar. 18, 2019)). "A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Galgano v. County of Putnam*, No. 16-CV-3572, 2024 WL 1623401, at *104 (S.D.N.Y. Apr. 15, 2024) (quotation marks omitted) (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)); *see also Barkai v. Mendez*, No. 21-CV-4050, 2024 WL 811561, at *23 (S.D.N.Y. Feb. 21, 2024) (same); *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *10 (S.D.N.Y. Sept. 28, 2018) (same). An incarcerated person "bears the burden of showing that 'the protected conduct was a substantial or motivating factor' in the prison officials' disciplinary decision." *Holland v. Goord*, 758 F.3d 215, 225–26 (2d Cir. 2014) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). Additionally, "[t]he Second Circuit has made clear that courts are to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Terry*, 2018 WL 4682784, at *10 (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)); *see also Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (same); *Gunn v. Malani*, No. 20-CV-2681, 2023 WL 2664805, at *6 (S.D.N.Y. Mar. 28, 2023) ("Retaliation claims by

prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation omitted)).

Defendants do not dispute that the first two elements of a *prima facie* First Amendment claim have been adequately alleged here. (*See* Defs.' Mem. 5–6 (contesting only that the allegations have "any non-conclusory causal connection and support").) The Court concludes that these two elements have been sufficiently alleged. "As the Court has previously explained, the filing of prison grievances is constitutionally protected," and therefore allegations that the Plaintiff filed such grievances constitute protected speech for the purposes of a First Amendment retaliation claim. *Gunn v. Milani*, No. 20-CV-2681, 2024 WL 4124319, at *8 (S.D.N.Y. Sept. 9, 2024) (quotation marks omitted); *see also Gibson v. Burnett*, No. 22-CV-1122, 2026 WL 867138, at *8 (S.D.N.Y. Mar. 30, 2026) (treating the first element as satisfied where "[the d]efendants d[id] not challenge that [the p]laintiff's PREA complaints are protected activity under the First Amendment, nor could they"); *Salley v. Capra*, No. 23-CV-4566, 2025 WL 950991, at *5 (S.D.N.Y. Mar. 28, 2025) ("[I]t is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." (citation and quotation marks omitted)).

As to the second element, the focus of the inquiry is whether the "retaliatory conduct [ ] would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003); *see also Marshall v. Griffin*, No. 18-CV-6673, 2020 WL 1244367, at *6 (S.D.N.Y. Mar. 16, 2020) (explaining that "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens"

(citation omitted)). Again—aside from their general assertion that Plaintiff's allegations are conclusory—Defendants do not dispute that Plaintiff's pleadings support this element. (*See* Defs.' Mem. 5–6.) The Court likewise concludes that this element is satisfied. "A statement uttered by a prison official, in retaliation for protected activity, reasonably calculated and intended to incite inmates, prisoners, or fellow corrections workers to retaliate against an inmate can form the basis for a cognizable retaliation claim under section 1983." *Gill v. Calescibetta*, No. 00-CV-1553, 2009 WL 890661, at *12 (N.D.N.Y. Mar. 31, 2009). So, too, "verbal harassment by prison officials" can be "actionable" so long as there is "resulting physical harm to a plaintiff." *Id.* Here, Plaintiff has alleged both verbal harassment that resulted in physical harm, and statements inciting incarcerated individuals to retaliate against Plaintiff. *See* Section I.A, *supra*. This suffices, at least on a Motion to Dismiss, to establish the requisite "adverse action" element. *Schmiege v. Deputy Sec. Stachowski*, No. 22-CV-1371, 2026 WL 698799, at *5 (N.D.N.Y. Mar. 12, 2026) (denying summary judgment where "[two defendants] approached [another individual] . . . directing him to attack [p]laintiff because of the effect his grievances were having on them, i.e. making the block 'hot[,]'" and an assault did, in fact, occur); *Braswell v. Bujnicki*, No. 16-CV-1431, 2016 WL 7441066, at *4 (D. Conn. Dec. 27, 2016) (reasoning that allegations of attacks by officers constituted adverse action). Plaintiff has also alleged that he was denied protective custody in retaliation for filing of grievances, a fact that, if proven, can demonstrate the requisite adverse action. *See Cruz v. Hillman*, No. 01-CV-4169, 2002 WL 31045864, at *6 (S.D.N.Y. May 16, 2002) (holding that the plaintiff had alleged an adverse action where the plaintiff alleged that he was "denied protective custody in retaliation for his prior lawsuit," "denied the opportunity even to *apply* for protective custody" and that, in the

denial, a defendant "acted entirely outside the normal internal process" of reviewing such requests).

This leaves the third element: facts sufficient to support a causal relationship between the protected activity and the alleged retaliation. Defendants argue that Plaintiff has not provided sufficient "factual support" for a causal connection, and therefore has not stated a plausible retaliation claim. (Defs.' Mem. 5–6.) The Court disagrees: Plaintiff's various filings, read together, also support the third element of causality. Namely, Plaintiff alleges that each of the named Defendants, with the exception of Miller, directly referred to Plaintiff's being a "rat" when prompting inmates to harass him, (*e.g.* Dkt. No. 51 at 3 (specifically alleging these facts as to Johnson); Dkt. No. 55 at 1 (same as to Bell and Johnson); Dkt. No. 55 at 1 (alleging Miller was aware of this); Dkt. No. 56 at 3 (same as to Bell, Pagan, and Johnson).)[9] This type of "express statement demonstrates the causal connection between the protected activity and the alleged retaliation." *Gibson*, 2026 WL 867138, at *10; *see also Hayes v. Dahlke*, 976 F.3d 259, 273 (2d Cir. 2020) (concluding that "the very language" in an assertedly retaliatory misbehavior report supported the possibility that action causally connected to the report on the basis that it "ties the protected act to the retaliation," including a statement by defendant that if "you mess with one of us, you got to mess with all of us" (internal quotation marks and citation omitted)); *Arriaga v. Annucci*, No. 23-CV-1941, 2024 WL 1743300, at *12 (S.D.N.Y. Apr. 23, 2024) (reasoning that comment suggesting retaliatory animus supported causality); *Henderson v. Hembrook*, No. 18-CV-6091, 2023 WL 6258944, at *7 (W.D.N.Y. Sept. 26, 2023) (noting that

[9] The use of the term "rat" is part of what makes this connection plausible: the term "rat" is often used to refer to an "informer" and might plausibly be understood to be a direct reference to the filing of grievances. *See* Rat, Dictionary.com, https://www.dictionary.com/browse/rat [https://perma.cc/L9QE-WKC6] (last visited Sept. 15, 2026).

"direct evidence of a retaliatory motive," in the form of comments by prison officer stating he acted in retaliation for filing grievances, can overcome other circumstances that might weaken causal inference, and collecting cases). The timeline of events alleged in Plaintiff's pleadings, read in the light most favorable to him as the non-movant, also supports causation. Plaintiff claims that he filed a grievance and PREA report on March 10, 2024, (Dkt. No. 32 at 4), that he either signed off on the same grievance or filed a new one on May 8, 2024, (Dkt. No. 56 at 2), and that he made an additional PREA complaint on May 11, 2024, (Dkt. No. 51 at 1). On May 8, 2024, or shortly thereafter, Plaintiff was subjected to the first attack by another incarcerated individual, when a bucket of water was thrown into his cell, (*id.*), and within a matter of weeks, Plaintiff was physically assaulted by incarcerated individuals due to Defendants' prompting, and without any intervention from multiple of the Defendants, (Dkt. No. 1 at 5; Dkt. No. 6 at 1; Dkt. No. 27 at 2; Dkt. No. 46 at 3; Dkt. No. 51 at 1–2; Dkt. No. 56 at 5). In the context of a Rule 12(b)(6) motion, this timeline plausibly supports the existence of a causal connection. *Gibson*, 2026 WL 867138, at *10 (adverse action "a matter of weeks after [the p]laintiff attempted to file his PREA complaint" supported causal connection on a Motion to Dismiss pursuant to Rule 12(b)(6)); *Schmiege*, 2026 WL 698799, at *5 (allegations of verbal harassment, when combined with temporal proximity and allegations that defendants prompted a third party to attack the plaintiff, were sufficient to support causal connection); *Hayes*, 976 F.3d at 273 (finding temporal proximity of one month between protected activity and adverse action supported causal connection); *Arriaga*, 2024 WL 1743300, at *12 (concluding allegations "strongly support[ed]" a causal connection where plaintiff claimed he had been subject to adverse actions "in the days following" the protected activity, further adverse action "in the subsequent weeks" and a final adverse transfer from the facility "only three months later").

2. Personal Involvement

"[B]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see also Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (same). In other words, "a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020); *see also Washington v. Morley*, No. 21-CV-7159, 2024 WL 4252596, at *4 (S.D.N.Y. Sept. 20, 2024) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under 42 U.S.C. § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." (citation and quotation marks omitted, alterations adopted)). Accordingly, "a plaintiff may not rely on a special test for supervisory liability;" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d at 616, 618.

Defendants move to dismiss Plaintiff's pleadings on the basis that he has not alleged their personal involvement in the incidents alleged. (Defs.' Mem. 6–7.) As to Defendant Miller, the Court agrees. The sum total of Plaintiff's allegations against Miller is that Plaintiff informed Miller—both personally and by letter—that he needed to be placed in protective custody. (Dkt. No. 46 at 2; Dkt. No. 27 at 2.) Miller seems to have been unresponsive. (*See* Dkt. No. 46 at 2; Dkt. No. 54 at 1.) Miller also received an unspecified OSI report related to Plaintiff, (Dkt. No. 46 at 2), and Plaintiff's family reported unspecified concerns about his safety, but Miller remained unresponsive throughout, (Dkt. No. 54 at 1). Where a "[p]laintiff alleges that he sent a complaint to [a] [d]efendant . . . and did not receive a response, failure to respond to a complaint does not demonstrate personal involvement." *Wright v. Cooke*, No. 20-CV-1284, 2023 WL

5891082, at *10 n.6 (D. Conn. Sept. 11, 2023), *aff'd sub nom. Wright v. Martin*, No. 23-7762, 2025 WL 1091221 (2d Cir. Apr. 8, 2025) (summary order); *see also Campbell v. Guadarrama*, No. 25-CV-2148, 2026 WL 1864034, at *5 (D. Conn. June 29, 2026) (explaining that "receipt alone of grievances or letters" generally does not constitute personal involvement). Nor does Plaintiff allege, except in the most conclusory fashion as part of a group pleading, that Defendant Miller was aware of the attacks on Plaintiff and asserted retaliation, including because he has not alleged the substance of his communications with Miller. (*See* Dkt. No. 55 at 1 (making such an allegation as part of a group pleading that multiple defendants were aware of and/or participated in propagating the narrative that Plaintiff was a "rat").) The Court is not obligated to credit this legal conclusion, even on a Motion to Dismiss pursuant to Rule 12(b)(6). *See Hamilton v. Martucello*, No. 24-CV-6500, 2025 WL 713032, at *7 (W.D.N.Y. Mar. 5, 2025) (declining to credit allegations that a defendant "was extraordinarily informed as to the constitutional wrongs being done" against the plaintiff, but nevertheless failed to act). For the same reason, Plaintiff has not alleged facts sufficient to permit the Court to conclude that the failure to respond constituted deliberate indifference, as might support a supervisor's personal involvement. *See Walker v. Rosa*, No. 24-CV-1171, 2025 WL 1303880, at *7 (N.D.N.Y. May 6, 2025) (noting a plaintiff may be able to show liability if the plaintiff could plead facts demonstrating the defendant "failed to remedy a wrong after being informed through a report or appeal" or "failed to act on information indicating that unconstitutional acts were occurring"), *report and recommendation adopted*, 2025 WL 1527226 (N.D.N.Y. May 29, 2025); *Braxton/Obed-Edom v. City of New York*, No. 17-CV-199, 2018 WL 11316020, at *6 (S.D.N.Y. Dec. 20, 2018) (also describing this route to liability in the Eighth and Fourteenth Amendment deliberate indifference context), *report and recommendation adopted*, 368 F. Supp. 3d 729 (S.D.N.Y. 2019).

The same cannot be said as to the remaining Defendants. Defendant Pagan is alleged to have prompted inmates to harass Plaintiff and call him a "rat" in retaliation for filing grievances, (Dkt. No. 56 at 3), watched a resulting assault without intervening, (*id.* at 5), denied Plaintiff protective custody, (*id.*), and failed to escort him to his cell, at which point he may have been assaulted, (*id.*; Dkt. No. 46 at 3). This is enough on a Motion to Dismiss to support personal involvement. *See Fields v. City of Bridgeport*, No. 23-CV-1608, 2025 WL 562651, at *7 (D. Conn. Feb. 20, 2025) (explaining personal involvement may be shown by allegations constituting "indirect participation, such as ordering or helping others to do the unlawful acts" (quotation marks omitted)); *Willey v. Kirkpatrick*, 664 F. Supp. 2d 218, 223 (W.D.N.Y. 2009) (concluding that a defendant who allowed individuals to harass the plaintiff and abdicated his legal duty to prevent the harassment, who had been made aware of and had responded, albeit inadequately, to the situation, was alleged to have been personally involved in the unlawful activity). So, too, failure to intervene in an assault can constitute personal involvement in a constitutional deprivation. *See Reeves v. City of New York*, No. 24-CV-2408, 2026 WL 309532, at *7 (E.D.N.Y. Feb. 5, 2026) (explaining that failure to intervene by officers in alleged use of excessive force constitutes personal involvement); *Palm v. Brooks*, No. 22-CV-9729, 2024 WL 1908388, at *4 (S.D.N.Y. May 1, 2024) (explaining personal involvement can be supported by allegations that a defendant was "present during the assault with reasonable opportunity to intercede on [the] plaintiff's behalf yet failed to do so" (quotation marks omitted)). The same is true of the remaining Defendants who have sought to dismiss for lack of involvement, for substantially the same reasons.[10]

---

[10] To spell each of these Defendants' personal involvement out: Defendant Johnson was informed that Plaintiff needed protective custody, (Dkt. No. 51 at 1), reportedly denied his

3. Failure to Protect & Negligence Claims

It is well-established that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration and citation omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Rather, "[t]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.'" *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020) (quoting *Farmer*, 511 U.S. at 834); *accord Randle v. Alexander*, 960 F. Supp. 2d 457, 473 (S.D.N.Y. 2013) (same). To satisfy the first prong, often referred to as the "objective" prong, Plaintiff must "establish the deprivation of a basic human need such as reasonable safety," due to Defendant's "creation of a substantial risk of harm." *Bouknight v. Shaw*, No. 08-CV-

request, (Dkt. No. 56 at 3), and moved him to a specific block so that he would be harassed by other incarcerated individuals, (*id.*), told him he would be placed in protective custody, even though he was not, (Dkt. No. 27 at 2), directed incarcerated individuals to harass him, including while listening in to gain leverage to use against him, (Dkt. No. 51 at 3; Dkt. No. 55 at 1), and later denied him protective custody again, (Dkt. No. 56 at 5). Bell is alleged, in retaliation for the PREA grievance Plaintiff filed, to have prevented Plaintiff from going to a grievance call out and directly called him a rat, (Dkt. No. 56 at 3); told "inmates [to] target [him]" and had Plaintiff "removed from [protective custody]," (Dkt. No. 27 at 1); prompted incarcerated individuals to harass Plaintiff while monitoring him on the cell's intercom to get information to relay to other incarcerated people so that he would be targeted, (Dkt. No. 51 at 2); directed other incarcerated individuals to harass Plaintiff, (Dkt. No. 55 at 1); and personally harassed Plaintiff in a manner that, he claims, directly led to attacks by other incarcerated people, (Dkt. No. 56 at 5; Dkt. No. 46 at 2; Dkt. No. 51 at 1).

Finally, although Defendants assertedly move to dismiss the claims against Kreischer, (*see generally* Defs.' Mem.), as mentioned above the Court lacks jurisdiction over Kreischer due to Plaintiff's failure to serve him, (*see* Dkt. No. 18 (process receipt and return of service unexecuted as to Kreischer); *see generally* Dkt. (showing no waiver of service as to Kreischer)).

5187, 2009 WL 969932, at *4 (S.D.N.Y. Apr. 6, 2009) (citation and quotation marks omitted). To satisfy the second prong, often referred to as the "subjective" prong, a plaintiff must allege that a defendant "acted maliciously and sadistically to cause harm or, at least, was deliberately indifferent to an excessive risk to inmate health or safety." *Id.* at *5 (quotation marks omitted).

Defendants do not challenge that the first prong is satisfied. (*See generally* Defs.' Mem.) Indeed, the Court readily concludes that the first prong is satisfied because Plaintiff "alleges more than verbal threats." *Hill v. Annucci*, No. 18-CV-1203, 2019 WL 8192266, at *6 (N.D.N.Y. Nov. 25, 2019). Among other things, Plaintiff has alleged "multiple serious assault[s]," which led to him getting cut and receiving stitches, as well as being "targeted by known gang members" as a result of the rumors that he was "an informant" (*i.e.*, a rat). *Id.* This is enough to satisfy the objective prong of the analysis. *Id.* *Cf. Bacon v. Evans*, No. 20-CV-6337, 2021 WL 5643038, at *5 (S.D.N.Y. Dec. 1, 2021) (holding that allegations did not satisfy the first prong where "[the] [p]laintiff allege[d] that after [the d]efendant made the aforementioned comments, unidentified inmates verbally threatened him, [but] . . . d[id] not allege that he actually suffered physical harm or that physical harm was reasonably imminent, which is fatal to his claim").

As to the subjective prong of the analysis, "[a] prerequisite to alleging deliberate indifference by a correction[s] officer as part of an Eighth Amendment claim based on a failure to protect is an allegation that the officer was aware that the inmate faced a significant risk of serious injury." *Bacon*, 2021 WL 5643038, at *5. Defendants argue that Plaintiff has alleged no more than mere negligence on any of their parts, and so has not alleged facts sufficient to support the subjective prong. (*See* Defs.' Mem. 8–11.) The Court disagrees: Plaintiff has alleged "acts or omissions for the very purpose of causing harm or with knowledge that harm will result."

*Farmer,* 511 U.S. at 835. This, the Supreme Court has explained, is *above and beyond* what is required to state a viable Eighth Amendment claim, which requires "something less" akin to criminal recklessness. *Id.*; *see also Jenkins v. Officer S (Downstate)*, No. 19-CV-10728, 2021 WL 4392611, at *4 (S.D.N.Y. Sept. 24, 2021) (explaining that "inciting and encouraging a violent attack plausibly suggests *at least* deliberate indifference" (emphasis added)); *Jhagroo v. Brown*, No. 16-CV-3426, 2020 WL 419450, at *7 (S.D.N.Y. Jan. 27, 2020) ("'[I]ntentionally exposing an inmate to the risk of harm through violence with no penological purpose is indicative of deliberate indifference to the inmate's safety' in violation of the Eighth Amendment to the U.S. Constitution." (alterations omitted) (quoting *Mirabella v. Corr. Officer O'Keenan*, No. 15-CV-142, 2016 WL 4678980, at *4 (W.D.N.Y. Sept. 7, 2016))); *see also Smith v. Miller*, No. 15-CV-9561, 2017 WL 4838322, at *12 (S.D.N.Y. Oct. 23, 2017) (same). Among other allegations that make this claim plausible, Plaintiff alleged that he was cursed out by Defendant Bell, (Dkt. No. 51 at 1), who told him to "suck her [d]ick" prior to the attack, (Dkt. No. 27 at 1), "had inmates target [him]," (*id.*) and shortly thereafter called him a rat, (Dkt. No. 56 at 3). *See Jenkins*, 2021 WL 4392611, at *4 (explaining allegation that "[the] [p]laintiff and [the] [d]efendant had a verbal altercation only two days before the attack . . . contributes to making [the] [p]laintiff's claim plausible"); *Jhagroo*, 2020 WL 419450, at *7 (denying a summary judgment motion where, inter alia, the inmate and officer "had a profanity-laced disagreement" before the attack). Similarly, Plaintiff has alleged that the other Defendants engaged in propagating the claim that he was a "rat" and connected that claim to his filing the grievance. *See* Section I.A, *supra*. *See St. Louis v. Bodin*, No. 23-CV-977, 2023 WL 8258917, at *4 (D. Conn. Nov. 29, 2023) (holding that where the plaintiff alleged that he suffered "appreciable

harm" resulting from an officer's alleged verbal harassment, the plaintiff could proceed on an Eighth Amendment claim, given a need to "further develop[] . . . the record").

Plaintiff has also alleged that Defendants were present for at least some of the attacks against him. *See Jenkins*, 2021 WL 4392611, at *4 (explaining that similar allegations of presence enhanced plausibility of allegations of a defendant's involvement in an attack by other inmates on a Motion to Dismiss). Further, Plaintiff has alleged that he repeatedly informed Defendants of multiple threats of a "hit" on his life or otherwise that he would be harmed. *See* Section I.A, *supra*. This, too, is suggestive of "subjective" awareness on a Motion to Dismiss pursuant to Rule 12(b)(6). *See McCormick v. Cnty. of Westchester*, No. 19-CV-2916, 2023 WL 2632204, at *6 (S.D.N.Y. Mar. 24, 2023) (noting that "courts have found that the subjective prong was satisfied where the defendants knew of a prior altercation between the plaintiff and his attacker, or of threats that had been made against the plaintiff" and collecting cases (quotation marks omitted)); *Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *13 (S.D.N.Y. Mar. 30, 2016) ("Courts have found that, when an inmate informs corrections officers about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect." (quotation marks omitted)). While it may turn out that, as Defendants argue, they did not have a reasonable opportunity to intercede or that Plaintiff did not sufficiently place some of them on notice of the risk of harm, (Defs.' Mem. 9–10), the Court must credit Plaintiff's allegations at the Motion to Dismiss stage.

Defendants reiterate these arguments as to Plaintiff's negligence claim under New York law. (*Id.* at 11–12.) However, for the same reasons that the Court concludes that Plaintiff has alleged facts sufficient to support the conclusion of subjective awareness of a risk of harm by Defendants as to his Eighth Amendment claim—and because Defendants concede that the two

claims rise and fall together, (*id.*)—the Court concludes that Plaintiff has alleged facts sufficient to support awareness on his state negligence claim.[11]

4. Qualified Immunity

Defendants argue that they are entitled to qualified immunity. (Defs.' Mem. 12–13.) However, Defendants identify no reason, separate and apart from those discussed above, that the law of qualified immunity would apply either to Plaintiff's First Amendment retaliation claim or Plaintiff's Eighth Amendment claim. (*Id.*) Defendants have not identified any ambiguity in the applicable legal standard. *Cf. Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 467 (S.D.N.Y. 2012) (denying a qualified immunity application where the defendant "ha[d] not identified any changes in the legal standards"); *Jenkins*, 2021 WL 4392611, at *5 (same). Nor is the law regarding failure to protect inmates or First Amendment retaliation unsettled or unclear. *See Farmer*, 511 U.S. at 834 (describing the requirements for an Eighth Amendment failure to protect claim); *Lewis v. Siwicki*, 944 F.3d 427, 430–31 (2d Cir. 2019) (same); *Gibson*, 2026 WL 867138, at *15 ("At the time the alleged violation occurred, the test for First Amendment retaliation was clearly established in this Circuit."). Thus, the Court rejects Defendants' qualified immunity argument, and denies the Motion insofar as it seeks to dismiss Plaintiff's failure to protect or retaliation claims on this basis.

---

[11] While it may emerge, at a later point in the proceedings, that Defendants were acting within their scope of employment and the claims are therefore barred by New York Correction Law § 24(1), there are no allegations in the Complaint from which the Court could conclude that Defendants acted within their scope of employment such that this bar would apply. *Cf. Smith v. Aitehenson*, No. 24-CV-1562, 2026 WL 472573, at *5 (N.D.N.Y. Feb. 19, 2026) (explaining that allegations that the defendants were acting within their scope of employment necessitated the dismissal of state law assault and battery claims against prison officials). Accordingly, the Court declines to dismiss this claim as barred by the state Correction Law at this time. (*See* Defs.' Mem. 11 n.3.)

## III. Conclusion

For the reasons set forth above, the Motion to Dismiss is granted insofar as it seeks to dismiss the claims asserted against Defendant Miller, but is otherwise denied. The dismissal of Defendant Miller is without prejudice. If Plaintiff wishes to file an Amended Complaint, he must do so within 30 days from the date of this Opinion. The Amended Complaint will replace the Complaint, and so must contain ***all*** allegations and ***all*** Defendants that Plaintiff wants to include in this Action. As discussed in note 2, supra, Plaintiff has 60 days from the date of this Opinion and Order to provide information that would permit the United States Marshals Service to serve the Defendants that have not yet been served in this Action. The Clerk of the Court is respectfully directed to terminate the pending Motion at Dkt. No. 57.

SO ORDERED.

Dated: September 29, 2026
White Plains, New York

KENNETH M. KARAS
United States District Judge